IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 14-00346-01-CR-W-DGK |
| JOHN F. BOWEN, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress evidence on the ground that at the time police entered defendant's home to execute an arrest warrant, they had no search warrant or consent, and police did not know at the time they entered the residence that defendant was there. I find that (1) the officers had a reasonable belief that defendant lived at 3447 Agnes and (2) they had reason to believe that defendant was present at the time entry was made and the arrest warrant was executed. Therefore, defendant's motion to suppress should be denied.

*I.* **BACKGROUND**

On December 10, 2014, officers went to defendant's residence to execute a felony arrest warrant. They observed a Trans Am illegally parked in front of the house. The license plates on that car were registered to a Camaro which had been driven by defendant, and a GPS tracking device had been placed on the Camaro. After knocking and announcing for five or ten minutes, an officer saw someone peering out from behind a sheet in the window of an upstairs bedroom. The front door of the residence was unlocked, and officers opened it. From the front porch, they continued to call out to

defendant, directing him to surrender. After some time, the tactical unit entered the residence and cleared the basement and ground level. They stayed at the bottom of the staircase calling out to defendant for another 30 to 45 minutes. At some point a female came down from the second floor and indicated that defendant was upstairs and that she had been in the process of buying methamphetamine from him when police arrived. Eventually defendant came out of the bedroom and was taken into custody.

According to the government's response[1] while clearing the second floor of the residence for officer safety, the tactical unit officers observed in plain view four plastic bags containing what appeared to be methamphetamine. A search warrant was obtained and police recovered 430 grams of methamphetamine, two bolt action rifles, 28 rounds of .38 caliber ammunition, 52 rounds of 12-gauge shotgun shells, $640 in cash, a scale with drug residue, and small ziplock plastic drug packaging paraphernalia. Traffic citations were issued for the illegally parked Trans Am. The car was inventoried before towing. In the center console, police found 10 grams of methamphetamine and a Social Security card bearing defendant's name.

On December 11, 2014, a complaint was filed charging defendant with possession with intent to distribute methamphetamine. An indictment was returned on December 17, 2015, charging the same offense. Defendant filed the instant motion to suppress on March 10, 2015. On March 27, 2015, the government filed a response, arguing that police may enter a dwelling in which the suspect lives if the officers have a

---

[1]No evidence was presented on the actual seizure of the methamphetamine because defendant only challenged the police entry into the residence (Tr. at 2-4). Therefore, the issue is whether seizure of the methamphetamine was the fruit of an illegal entry (Tr. at 2-4).

2

Case 4:14-cr-00346-DGK   Document 37   Filed 04/20/15   Page 2 of 15

valid arrest warrant and reason to believe the suspect is within, and that the facts of this case establish that police had reason to believe that defendant was inside the residence when police entered it.

On April 1, 2015, I held an evidentiary hearing on defendant's motion to suppress. The government appeared by Assistant United States Attorney Rudolph Rhodes. The defendant was present, represented by Assistant Federal Public Defender Ronna Holloman-Hughes. The following witnesses testified:

1. Detective Larry Chronister, Fugitive Apprehension Unit of the Kansas City, Missouri, Police Department, assigned to the FBI Violent Crimes Fugitive Task Force

2. Detective John Cooley, Kansas City, Missouri, Police Department

3. Officer Larryn Lewis, Kansas City, Missouri, Police Department

4. Officer Charles Evans, Kansas City, Missouri, Police Department, Tactical Response Team

In addition, the following exhibits were admitted:

P. Ex. 1     Bench warrant for the arrest of defendant for failure to appear in an aggravated assault on law enforcement officer case, issued in Wyandotte County, Kansas, on April 29, 2014

P. Ex. 2     Court order for tracking of cellular telephone

P. Ex. 3     Search warrant for GPS tracking of vehicle

P. Ex. 6     Photograph of 3447 Agnes showing upstairs window

P. Ex. 9     Photograph of the bedroom of 3447 Agnes where defendant was hiding, showing a bed sheet on the window

D. Ex. 10    Photograph of door jam

D. Ex. 11    Photograph of front porch of 3447 Agnes, showing debris including doors and chairs

D. Ex. 12    Photograph of 3447 Agnes

## II.    EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.    On November 24, 2014, Detective Larry Chronister with the Fugitive Apprehension Unit of the Kansas City, Missouri, Police Department, assigned to the FBI Violent Crimes Fugitive Task Force, received a call from Major Webb from USD 500[2] requesting assistance with the apprehension of defendant (Tr. at 6, 8, 24). An outstanding felony warrant for a court violation on a drug sales case had been issued by Shawnee County, and a felony warrant for aggravated failure to appear on a felony charge of aggravated assault on a law enforcement officer had been issued in Wyandotte County (Tr. at 10-11). A Shawnee County detective had contacted the USD 500 school about defendant (Tr. at 6, 24). Major Webb had previously worked with Detective Chronister at the Kansas City, Kansas, Police Department and knew that Detective Chronister was now with the Fugitive Apprehension Unit (Tr. at 6). Defendant had been described as dangerous, and the school wanted the help of Detective Chronister (Tr. at 6, 7).

2.    Detective Chronister went to the Welborn Elementary School at 5200 Leavenworth Road in Kansas City, Kansas, that afternoon (Tr. at 6, 8, 24). He observed Marcy Sorrell, the mother of the child defendant was expected to pick up,

---

[2]USD 500 refers to the Kansas City, Kansas, school district.

arrive to pick up the child; and he made note of her car (Tr. at 8, 24). Detective Chronister had gathered all the information he could from multiple databases regarding defendant and Marcy Sorrell (Tr. at 6-7). Marcy Sorrell also had outstanding felony warrants (Tr. at 7). At the school, he received information about the cars driven by Marcy Sorrell and defendant (Tr. at 7). He was also told by school officers that defendant had been described as dangerous (Tr. at 7).

     3.     On November 25, 2014, a surveillance unit was set up at the school (Tr. at 8). One of the units observed someone in Marcy Sorrell's car dropping off the child (Tr. at 8). About three blocks away from the school, uniformed officers stopped the car, and Ms. Sorrell was arrested on the outstanding felony warrants (Tr. at 9, 24).

     4.     Detective Chronister subsequently interviewed Ms. Sorrell about defendant's whereabouts (Tr. at 9). Ms. Sorrell provided an address of 6336 State Avenue in Kansas City, Kansas, where she said defendant had a shop or garage bay where he did automotive work on cars (Tr. at 9, 10, 24-25, 39). She said that defendant would be driving a purple Camaro possibly an 80s model (Tr. at 10). Detectives drove to the location on State Avenue (Tr. at 12, 40). The bay rented by defendant and Ms. Sorrell was a makeshift mechanic's shop (Tr. at 25, 41). The shop was open but unattended (Tr. at 41). There was a hydraulic car lift and some semblance of auto mechanic work being done there (Tr. at 41). Police spoke with the person responsible for the entire property and was told that there was a manager for the entire place but that each garage bay was rented to different individuals (Tr. at 13). Officers confirmed with the manager the location of defendant's bay (Tr. at 40). The purple Camaro was in defendant's garage bay along with two dogs, but no one, including defendant, was

5

Case 4:14-cr-00346-DGK   Document 37   Filed 04/20/15   Page 5 of 15

there (Tr. at 14, 40).  The purple Camaro was registered to defendant's aunt (Tr. at 62-63).

5.	Ms. Sorrell then provided information about where they had been living at 3447 Agnes in Kansas City, Missouri, with Antone Artman who also had outstanding felony warrants (Tr. at 12, 14, 39).  Ms. Sorrell stated that she lived at that residence with defendant, Mr. Artman, a school aged child and an infant (Tr. at 15).

6.	Detective Chronister verified that Mr. Artman had an outstanding warrant (Tr. at 14, 41).  He obtained a photograph of Mr. Artman from a cooperating agency and shared that with the other officers (Tr. at 15).  A detective went to 3447 Agnes and saw Mr. Artman and the black Dodge pickup truck that Ms. Sorrell had said belonged to Mr. Artman (Tr. at 14, 42).  The detective tried to follow Mr. Artman when he left in the truck, but the detective lost sight of the vehicle (Tr. at 15, 42).

7.	About 20 minutes later, Detective Cooley observed Mr. Artman drive up to the shop on State Avenue (Tr. at 42-43).  Detective Cooley stopped the truck, identified Mr. Artman as the driver, and placed him under arrest for the outstanding warrant (Tr. at 43).  Mr. Artman had methamphetamine in his jacket pocket (Tr. at 43).  He chose not to talk to police (Tr. at 44).  He has remained in custody in the Wyandotte County Detention facility since the date of his arrest (Tr. at 43).

8.	Marcy Sorrell continued to cooperate and provided information about the cell phone used by defendant (Tr. at 16).  The following day, Detective Chronister obtained a court order authorizing GPS location information on the cell phone (Tr. at 16, 25, 44; P. Ex. 2).  He also obtained a search warrant authorizing installation of a GPS tracking device on the Camaro Z-28 driven by defendant (Tr. at 18, 44; P. Ex. 3).  The

6

tracking device was placed on defendant's car on December 4, 2014 (Tr. at 19; P. Ex. 3). Over the next week, the tracking device indicated that the car was in the vicinity of 3447 Agnes several times -- the tracker indicated that the car was in that area once or twice during the weekend but then it was located at the shop in Kansas City, Kansas, in an inoperable condition for the remainder of the investigation (Tr. at 27, 28). When the GPS tracker indicated the car was in the area of 3447 Agnes, the officers were not available to go to that address (Tr. at 29).

9. On December 10, 2014, officers set up surveillance on 3447 Agnes and watched the residence for an hour or two (Tr. at 20). There were no lights on inside the residence, and there were no cars parked in the driveway or on the street in front of the residence (Tr. at 45). The officers saw no movement inside the residence (Tr. at 45, 61). Detective Chronister received information from the phone company that defendant's phone had been detected in Lawrence, Kansas, heading toward Kansas City (Tr. at 45, 61). They believed that he may be headed to his shop in Kansas City, Kansas, so the officers left the Agnes location and went to the State Avenue shop area (Tr. at 21, 46). As they were heading to that area, the phone company notified them that the tracking stopped -- the phone could have been turned off (Tr. at 46). Officers were unable to locate any of the cars associated with defendant in the area of the mechanic's shop (Tr. at 21).

10. About 30 minutes after the GPS tracking had stopped, the phone company notified officers that it had been turned back on and was in the area of 3447 Agnes back in Kansas City, Missouri (Tr. at 21, 47). The officers headed back over to the Agnes address (Tr. at 47). When they arrived, they saw a blue Pontiac Trans Am

7

illegally parked in the street in front of the residence which had not been there when they left (Tr. at 47, 62).  The license plate registered to the purple Camaro was on the Trans Am (Tr. at 21-22, 32, 47, 62).  The Trans Am had not been reported stolen and it was not registered to anyone (Tr. at 62).

      11.     Additional Kansas City, Missouri, officers responded to the area and they surrounded the residence (Tr. at 22, 48).  Officers who approached the front of the residence went to the front door and listened for a couple of minutes before knocking on the door and announcing their presence (Tr. at 49-50).  The officers did not hear any answer from within the residence (Tr. at 50).  For several minutes, the officers knocked loudly on the door and repeated that they were the police and were not going to go away (Tr. at 50).  A uniformed officer who was standing at the street in front of the house yelled to the officers on the porch that she had seen someone pull a sheet aside that was covering an upstairs window and a person peered outside (Tr. at 50, 65, 66).  The officers then knew there was someone inside refusing to come to the door (Tr. at 50).  The person had looked out from behind the sheet for a few seconds, but Officer Lewis, who was standing on the sidewalk in front of the house, was not able to see what the person was wearing or whether it was a man or a woman (Tr. at 67, 68).  Officer Lewis had not been shown a picture of the person the detectives were there to arrest but was there as back up to help surround the house (Tr. at 67).

      12.     The officers continued knocking very loudly on the front door (Tr. at 50).  They were shouting that they were there for defendant (using his name John Bowen), they knew he was in there, they were not going away, and defendant needed to come out and surrender (Tr. at 50, 71).  That went on for five to ten minutes, then the

8

decision was made to check the front door (Tr. at 50, 70). A tactical unit officer tried the front door and it was unlocked (Tr. at 50). The officer opened the door but no one went inside (Tr. at 51, 75). They could see the inside of the living room from the porch (Tr. at 51). The officers continued to shout that they knew defendant was inside and that he needed to surrender (Tr. at 51). For another 10 to 15 minutes, the officers stood on the porch shouting for defendant to surrender, but there was no response from anyone inside the house (Tr. at 71).

  13. The officers had heard dogs barking when they first knocked, and once the door was open they observed two dogs in the living room (Tr. at 51, 70). Ms. Sorrell had told Detective Finley and Detective Chronister that those dogs were very important to defendant and he generally did not go anywhere without those dogs (Tr. at 51, 56, 70). The officers had seen those same two dogs at the mechanic's shop when they searched there for defendant previously (Tr. at 13-14, 40-41, 51, 56). The shop had been open, defendant's Camaro was there, and the dogs were there, but defendant had not been found (Tr. at 41, 56). Ms. Sorrell had been taken to the mechanic shop after it was determined that defendant was not there, and she told the detectives that she could not believe those two dogs were there and defendant was not (Tr. at 57-58).

  14. Once a sergeant arrived on the scene, the decision was made to enter the house, clear it, and locate defendant (Tr. at 51, 71). When the tactical unit entered the house, one of the dogs ran out the front door and Animal Control was called (Tr. at 71). One tactical unit entered the house and cleared the first floor, finding no one (Tr. at 52). When they clear a level, the officers look anywhere that a human being could be hiding (Tr. at 71). From the front porch, a staircase leading to the second floor could be seen

9

(Tr. at 52). Because the officers knew there was someone on the second floor, officers on the porch covered the staircase while the tactical unit cleared the basement (Tr. at 52, 71). Before entering the basement level, the tactical unit again called out and announced their presence (Tr. at 71). No one was found in the basement (Tr. at 52).

15. The tactical unit officers then stood at the bottom of the staircase leading up to the second floor and began giving verbal commands to those upstairs that they needed to show themselves and come downstairs (Tr. at 53, 72). A few minutes after those commands had begun, a female appeared at the upstairs landing (Tr. at 53, 72). She was ordered to come downstairs, and she walked down the stairs and surrendered (Tr. at 53). The woman was taken into custody and escorted outside (Tr. at 53).

16. Detective Cooley interviewed the woman outside the house (Tr. at 53). Her name was Ann Cop (Tr. at 53). Ms. Cop reluctantly told Detective Cooley that defendant was in the house in an upstairs bedroom above the porch (Tr. at 53). This is the room where the person was observed peering out from behind a sheet (Tr. at 53). Ms. Cop said that defendant was her drug dealer and she had been there to buy methamphetamine from him (Tr. at 53). They had been in the middle of a drug transaction when the officers began knocking on the front door (Tr. at 53). She said they had been in the living room at the time and defendant had been holding a large bag of methamphetamine in his hand (Tr. at 53-54). When the officers knocked, defendant ordered her not to open the door or go to the door because bounty hunters had been looking for him (Tr. at 54). He ran upstairs with the bag of methamphetamine (Tr. at 54). She said she got scared and ran upstairs with him (Tr. at 54).

10

Case 4:14-cr-00346-DGK   Document 37   Filed 04/20/15   Page 10 of 15

17.     Detective Cooley relayed this information to the tactical unit officers who were still waiting at the bottom of the staircase (Tr. at 54, 72).  He then put Ms. Cop in his police car and drove her a few blocks away where other emergency personnel were being assembled for an Operation 100 -- a procedure used by the police whenever they have a potentially armed suspect barricaded and refusing to surrender (Tr. at 54).

18.     At the bottom of the staircase, Tactical Unit Officer Charles Evans used a mirror attached to a long pole to see up to the top landing of the stairs (Tr. at 72).  There were doors leading to three bedrooms and one bathroom at the top of those stairs (Tr. at 74).  For the next 30 to 45 minutes, the officers stayed at the bottom of the stairs calling to defendant telling him to surrender (Tr. at 72).  He did not respond (Tr. at 72).  Then the officers began hearing some movement and were afraid that defendant was going to try to move from room to room upstairs (Tr. at 73).  A noise flash diversionary device was deployed onto the upper landing of the stairs (Tr. at 73).  As soon as that was done, defendant stated that he was going to come out with his hands up (Tr. at 73).  He came to the top of the stairs and was talking on his phone (Tr. at 73).

19.     On the landing where defendant was standing were the doors to three bedrooms and a bathroom, and that floor of the house had not yet been cleared so the officers were not "safe" from those additional rooms (Tr. at 74).  Defendant refused to come down until the officers lowered their weapons (Tr. at 73).  Defendant turned around as if he were going to go back into the bedroom, and one of the officers announced, "taser," and used the taser on defendant who was then taken into custody (Tr. at 73). Once defendant was taken down the stairs, the tactical unit cleared the rest of the upstairs to make sure no one else was inside (Tr. at 74).

11

## III. ENTRY

The Supreme Court has stated that, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980); United States v. Glover, 746 F.3d 369, 373 (8th Cir. 2014); United States v. Collins, 699 F.3d 1039, 1041-1042 (8th Cir. 2012). A law enforcement officer cannot legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant unless exigent circumstances exist or consent is given. Steagald v. United States, 451 U.S. 204, 215-216 (1981).

> However, Steagald does not prevent police entry if the arresting officers executing the arrest warrant at the third person's home have a *reasonable belief* that the suspect resides at the place to be entered and have reason to believe that the suspect is present at the time the warrant is executed. United States v. Boyd, 180 F.3d 967, 977 (8th Cir. 1999) (citing United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996)) (citations and internal quotation marks omitted) (emphasis added). . . . The "officers' assessment need not in fact be correct; rather, they need only reasonably believe that the suspect resides at the dwelling to be searched and is currently present at the dwelling." United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996) (internal quotation marks omitted).

United States v. Powell, 379 F.3d 520, 523 (8th Cir. 2004). See also United States v. Junkman, 160 F.3d 1191, 1193 (8th Cir. 1998) (officers need only reasonably believe that the suspect resides at the dwelling, that assessment need not in fact be correct).

In this case, Marcy Sorrell told police that she lived with defendant at 3447 Agnes. The fact that all of the other information provided by Ms. Sorrell was verified by police and found to be true, coupled with the observations of the officers, led police

12

reasonably to believe that defendant lived at 3447 Agnes and that he was present when they arrived there the second time on the day of his arrest.

Marcy Sorrell told officers that defendant had a garage bay at 6336 State Avenue in Kansas City, Kansas, where he performed automotive work. Police went to that location and confirmed with a manager that defendant did rent a garage bay there where he performed automotive work.

Marcy Sorrell told officers that defendant drove a purple Camaro. When officers went to defendant's garage bay at 6336 State Avenue, the purple Camaro was in defendant's garage bay. The purple Camaro was registered to defendant's aunt.

Marcy Sorrell told officers that she and defendant lived with their children at 3447 Agnes in Kansas City, Missouri, along with a man named Antone Artman who was defendant's step father and drove a black Dodge pickup truck. Officers went to 3447 Agnes and observed Antone Artman leave that residence in a black Dodge pickup truck and drive to the area of defendant's garage bay in Kansas City, Kansas.

Marcy Sorrell told officers that Antone Artman had an outstanding felony warrant, and officers confirmed that was the case.

On the morning of the arrest, officers saw no lights on in the house, no movement in the house, and no cars parked in the driveway or on the street in front of the house. They attempted to go to the reported location of defendant's cell phone, but returned to the Agnes residence when they learned the cell phone had been tracked back there. When they arrived the second time, they saw a car parked in front of the residence which illegally bore the license plate registered to the Camaro defendant had been driving and was still in his shop in Kansas City, Kansas. While officers were

13

pounding on the door announcing their presence and calling out for defendant, one of the officers saw someone look out from behind a sheet hanging from a window in an upstairs bedroom. Therefore, officers knew that someone was in the house, that the person was aware police were there, and that the person was refusing to come to the door or respond to the police.

Marcy Sorrell had told police that defendant has two dogs and that he almost never goes anywhere without those dogs. When the dogs were found at defendant's shop but defendant was not found there, Ms. Sorrell expressed disbelief that defendant would leave those dogs unattended at his shop. At the time, he shop was open and his Camaro was there with the dogs, but no one was in the shop. When police first knocked on the front door of the residence at 3447 Agnes, they heard dogs barking inside. When police opened the unlocked front door of the residence and before going inside, they saw the same dogs inside the living room of the house that had been seen at defendant's shop.

Based on the information provided by Ms. Sorrell which had been corroborated by police, police reasonably believed information provided by Ms. Sorrell that defendant lived at 3447 Agnes with her.

Because defendant's cell phone had been tracked to the area of 3447 Agnes at the time officers arrived, the license plate registered to the car defendant had been driving was on a car at 3447 Agnes, there were dogs inside the house and defendant's girlfriend had told police he almost never goes anywhere without his dogs, and there was a person inside the house who was aware of the police and had chosen not to come to the door or respond to the officers, police reasonably believed that defendant

14

was present before the front door was opened and entry was made.  Therefore, police entry into the residence at 3447 Agnes was proper.

Police are entitled to enter and to search anywhere in the house in which the suspect might be found when executing an arrest warrant.  Maryland v. Buie, 494 U.S. 325, 332-333 (1990).  The search of the main level and basement level of the house was a search only into the areas where a human being could hide.  The search of the upstairs rooms only involved looking into areas where a human being could hide.  Therefore, there is no evidence that any impermissible search occurred.

### IV. CONCLUSION

Based on all of the above, I find that (1) the officers had a reasonable belief that defendant lived at 3447 Agnes and (2) they had reason to believe that defendant was present at the time entry was made and the arrest warrant was executed.  Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has 14 days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 20, 2015